2024 IL App (1st) 232361-U

No. 1-23-2361B

Order filed March 13, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
| v. | ) | 83 C 12701 |
| | ) | |
| ROBERT GACHO, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Adrienne E. Davis, |
| | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversed and remanded. Trial court erred in denying pretrial release. Court erred in finding defendant to be threat to safety of community. Remanded for imposition of pretrial-release conditions.

¶ 2    Defendant Robert Gacho was convicted by a jury of the 1982 kidnapping, armed robberies, and murders of two men. He was tried jointly with two codefendants—one by jury, the other by the bench—who were likewise convicted. The judge presiding over the joint trial (and the finder of fact for the codefendant who opted for the bench trial) was Judge Thomas Maloney,

who was later implicated in the Operation Greylord federal investigation for taking bribes to fix cases. See *Gacho v. Wills*, 986 F. 3d 1067, 1068 (7th Cir. 2021).

¶ 3    Judge Maloney was ultimately convicted of federal bribery charges, landing him fifteen years in prison. The evidence revealed that, among the many cases he fixed, Judge Maloney was taking a bribe on the very joint trial involving defendant. The codefendant who opted for a bench trial, Dino Titone, had paid Judge Maloney $10,000 for an acquittal. (He did not get one; the federal government's theory was that, by that point, Judge Maloney was aware of the federal scrutiny and thus convicted Titone to conceal his criminal scheme.) *Id.* at 1076.

¶ 4    In any event, Gacho repeatedly sought postconviction relief based on his trial judge's criminal behavior, winding through state court and later federal *habeas* proceedings. In 2021, the Seventh Circuit Court of Appeals granted him relief. The court ruled that

> "the acute conflict between Maloney's duty of impartiality and his personal interest in avoiding criminal liability created a constitutionally unacceptable likelihood of compensatory bias in Gacho's case. The judge took a bribe from Gacho's codefendant and promised to rig the joint trial in his favor, then reneged to evade detection. Under these circumstances Gacho—no less than Titone—was deprived of his due-process right to trial before an impartial judge." *Id*. at 1068.

¶ 5    With defendant's convictions vacated, the State elected to retry him, some 41 years after the crimes alleged, with defendant now age 69.

¶ 6    Defendant sought pretrial release under the new provisions of state law, what is commonly known as the Pretrial Fairness Act, pursuant to Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023). The State opposed pretrial release. The circuit court sided with the State,

ordering defendant's detention, finding him to be a threat to the community and determining that no set of pretrial-release conditions could mitigate that threat.

¶ 7    We hold that the State failed to prove, by clear and convincing evidence, that defendant is a real and present threat to the community or to any specific individual. We remand the cause to the circuit court for the imposition of conditions for pretrial release.

¶ 8                                    BACKGROUND

¶ 9    The State made a proffer in writing and orally, taken in large part from the evidence at the trial that resulted in defendant's conviction. We reprint the proffer below, nearly verbatim from the State's supplemental memorandum.

¶ 10    On December 11, 1982, defendant, along with co-defendants Joseph Sorrentino and Dino Titone, robbed and shot two known drug dealers, Aldo Fratto and Tulio Infelise. Defendant lured Fratto and Infelise to his home under the pretext of conducting a narcotics transaction. Defendant, Sorrentino, and Titone, all of whom were armed, then relieved Fratto and Infelise of their guns, drugs, and money. Sorrentino and Titone bound Fratto and Infelise, marched them out to Fratto's car, and drove them to a wooded area near the Desplaines River in Lemont, Illinois.

¶ 11    Defendant and his girlfriend, Kathryn DeWulf, followed Fratto's vehicle in DeWulf's car. Sorrentino and Titone then put Fratto and Infelise in the trunk of Fratto's car and shot them multiple times as defendant and DeWulf looked on. Defendant, Titone, Sorrentino, and DeWulf then drove back to Chicago in DeWulf's car. During the ride back, Sorrentino and Titone laughed about how Fratto and Infelise begged for their lives before being shot.

¶ 12    Early the next day, December 12, 1982, a forest ranger discovered Fratto's car, heard pounding from within the trunk, and called police. Opening the trunk, he found Fratto dead and Infelise barely alive. Both men were bound and had been shot multiple times. When the ranger

asked Infelise who did this, Infelise replied, "Robert Gott or Gotch, Dino, and Joe." Infelise again identified "Robert Gach, Dino, and Joe" when interviewed by police prior to his death on December 28, 1982.

¶ 13 At the scene, police recovered a .38 caliber revolver with six fired cartridge casings; a .25 caliber semi-automatic handgun; three fired .25 caliber cartridge casings, and multiple fired bullets. Police arrested defendant and Sorrentino later on December 12, 1982. Titone turned himself in a couple of days later. A grand jury indicted all three men on charges of murder, armed robbery, and aggravated kidnapping.

¶ 14 While in custody, defendant made a post-*Miranda*, court–reported statement to police implicating himself in the robbery, kidnapping, and murder of Fratto and Infelise.

¶ 15 Fratto's autopsy revealed that he sustained five gunshot wounds. The medical examiner recovered one .25 caliber bullet and two .38 caliber bullets from Fratto's body. Forensic analysis later determined the bullets had been fired from the weapons recovered at the scene.

¶ 16 Infelise's autopsy revealed that he sustained four gunshot wounds; analysis of the two .25 caliber bullets recovered from his body determined that they had been fired from the .25 caliber handgun found at the scene.

¶ 17 Both Fratto and Infelise died from multiple gunshot wounds. Their deaths were ruled homicides.

¶ 18 When police arrested defendant at his home in December 1982, they recovered an improvised explosive device ("IED"), a military blasting cap, a four-inch folding knife, and two handguns, a .357 caliber and .38 caliber. While being held prior to trial, defendant wrote letters to DeWulf asking her to leave Chicago until after the trial and stating that "he believes he can escape" from jail.

¶ 19    In his written motion for pretrial release and via his counsel's proffer, defendant argued that there was no evidence that he posed a threat to any witness or the victims' family, much less to the community at large. He noted that codefendant Dino Titone is deceased, as is the principal witness, Kathryn Dewulf. Defendant claimed that he is "not in contact with individuals associated with any prior arguably questionable lifestyle."

¶ 20    Defendant argued that, despite being incarcerated for nearly 41 years in the maximum security unit of Menard Correctional, "one of the most violent institutions in the state of Illinois," his behavior has been "commendable." He has not "picked up any new cases" or been placed in segregation; he received "no major tickets," only nonviolent policy infractions.

¶ 21    Defendant emphasized that, despite serving a sentence of life without parole and having no opportunity to earn good-time credit, he has "demonstrated positive adjustment and consistently rehabilitative behavior." Among the examples he listed were work performed in various prison industry shops that permitted him to "keep various prison/buildings' machinery in good working order" and an accommodation he received from the warden for his efforts to help stem a major flood in 2016 at Menard prison. The warden noted that defendant volunteered to assist with sandbagging efforts over a 56-hour period—"the most crucial hours leading up to the river crest"—and thanked him for his efforts. Defendant likewise pointed to his obtaining "Earned Program Sentence Credit" for his participation in various educational and program classes.

¶ 22    Defendant also noted his "numerous health-issues associated with the aging process." He is prescribed medications to manage high blood pressure and pain associated with osteoarthritis in both shoulders. He has suffered from an irregular heartbeat for which he has been prescribed medicine. He recently received surgery to repair a hernia.

¶ 23    Finally, defendant emphasized that the court must find him to be a *present* threat to the safety of the community or an individual. The crime of which he was accused was committed 41 years ago, and defendant had been a model (or at the very least, nonviolent) inmate during all those years he served in prison.

¶ 24    Defendant also argued that any perceived threat that he posed could be mitigated by pretrial release conditions. He would reside with his granddaughter, whose name and address he provided. He stated that he would abide by any pretrial conditions, specifically mentioning home detention and electronic monitoring.

¶ 25    In its oral findings, the court first found that defendant stood accused of detention-eligible offenses, and that the proof was evident or the presumption great that he committed those offenses. The court also noted that it was "not making any finding, and I don't believe the State asked regarding willful flight."

¶ 26    On the question of threat or dangerousness, the court stated that it was "not going to consider any negative behavior that was reported while Mr. Gacho *** [was] in custody." The court considered the nature of the allegations against defendant, including his self-incriminating statement, before finding that the "the defendant poses a real and present threat to the safety of any person or persons or the community based on the specific articulable facts, to wit, defendant was found with an IED and a military-style blasting cap. Defendant Gacho was accused of being party to the shooting deaths of two persons."

¶ 27    On the question of conditions, the court stated orally that "no condition or combination of conditions set forth under the statute could mitigate the real and present threat to the safety of any person or persons or the community based on the specific articulable facts of this case, and that less restrictive conditions would not avoid a real and present threat to the safety of any

person or persons or the community based on the specific articulable facts of this case because Mr. Gacho was identified by name by a victim prior to his death, and made inculpatory court reported statements."

¶ 28    In its written order, the circuit court found that defendant posed a real and present threat to the safety of a person or the community in that he "was found with an IED and a military-style blasting cap," as well as standing "accused of being a party to the shooting death of two persons." The court found that no set of conditions could mitigate his threat because "defendant was identified by name by a victim prior to death and made inculpatory statements in a court reported statement."

¶ 29    This appeal followed.

¶ 30                                    ANALYSIS

¶ 31    Under the new pretrial-release provisions, defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a) (West 2022); *id*. § 110-6.1(e). The State may detain an accused only if it establishes that the charged offense is eligible for detention and then proves that (1) the proof is evident or the presumption great that the defendant committed that detention-eligible offense; (2) the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case; and (3) no condition or combination of conditions can mitigate that real and present threat. *Id.* § 110-6.1(e).

¶ 32    The State must prove each and every one of these three facts by clear and convincing evidence. *Id*. Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the factfinder about the truth of the proposition in question." *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. If the State fails to carry its burden on any of these three

facts, the presumption of release remains, and detention is unlawful. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 33    Defendant did not file a supplemental memorandum before this court. His claims of error are thus limited to his notice of appeal. In the notice of appeal, among other things, defendant claims that the trial court erred in finding him a threat to the community and in finding that no set of conditions could mitigate that threat. The State filed a supplemental memorandum defending the trial court's ruling.

¶ 34    Our standard of review is unsettled. The author of this opinion is of the belief that detention orders should be subject to independent *de novo* review, with findings of historical fact reviewed for manifest error. See *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 80 (Ellis, J., specially concurring); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 67 (Ellis, J., specially concurring). The other panel justices believe that the first two factual findings—those of proof-evident and dangerousness or flight risk—should be reviewed for manifest error, while the third factual finding regarding conditions should be reviewed for an abuse of discretion. See *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36 (majority opinion); *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 44-50.

¶ 35    We need not resolve this question here, as our decision would be the same under any standard of review.

¶ 36    In his notice of appeal, defendant challenges the finding that he is a threat as follows:

"[I]t is uncontested that the defendant has been a model prisoner for the past 40 years (the alleged crime having occurred in 1982), having worked, received numerous commendations, and certificates of achievement. *** The State could point to no specific

nor reliable articulable facts demonstrating that he is a flight risk. Robert Gacho is now 69 years old and poses no threat to anyone. There is no real and present threat."

¶ 37    The State counters by noting the undeniably brutal nature of the crimes charged, which were premeditated and cold-blooded. The State reminds us that defendant gave an inculpatory statement; that his home contained guns, a knife, an IED, and a military blasting cap when the police searched it back in 1982; and that he wrote letters to the witness, Katherin Dewulf, back in 1984 suggesting that she flee Chicago and indicating that defendant planned to escape from prison. The State does not identify any individual whose safety is threatened; the State claims that defendant is a threat to the safety of the community.

¶ 38    The new statute provides a non-exhaustive list of considerations that may factor into a determination of dangerousness, including the nature and circumstances of the offense; the defendant's criminal and social history; the identity of any individual whose safety would be threatened; any statements made by the defendant; the age and physical condition of the defendant and of any victim or complaining witness; the defendant's access to weapons; and whether the defendant committed any offense while on some form of release from custody. 725 ILCS 5/110-6.1(g) (West 2022).

¶ 39    There is no question that the crimes charged were brutal and heinous. They were premeditated, not spontaneous. And defendant seemed content to arm himself with multiple guns and other deadly explosive devices. These allegations would typically be more than sufficient to establish that a defendant is a danger to the safety of the community, not to mention the safety of potential witnesses against him or other individuals.

¶ 40    But as we have emphasized before, the law requires the State to prove that defendant "poses a real *and present* threat" to the safety of an individual or the community. (Emphasis

added.) *Id.* § 110-6.1(e)(2); *People v. Sorrentino*, 2024 IL App (1st) 232363, ¶ 39. In most pretrial-release hearings, the crimes alleged are not particularly removed in time from the hearing itself, so allegations like the ones here could reasonably lead a court to conclude that a defendant's release could threaten the community or particular individuals (such as potential witnesses against him).

¶ 41    Here, the alleged crimes were committed in 1982. Defendant has spent the last 41 years in prison with no evidence of violent behavior. Defendant has spent more of his life inside prison walls than he has outside them. The witness against him is now deceased. Other than lay out for us defendant's (allegedly) brutal behavior 41 years ago, when defendant was 28 years old, the State has done nothing to establish why we should consider the 69-year-old version of defendant to be a threat to anyone. The State did not carry its burden of showing, by clear and convincing evidence, that defendant is a threat to the safety of the community.

¶ 42    We reverse the finding that defendant is a real and present threat to the safety of an individual or the community. A remand is appropriate for the circuit court to impose conditions of pretrial release. See 725 ILCS 5/110-2(b), 5(c) (West 2022).

¶ 43                          CONCLUSION

¶ 44    The judgment of the circuit court is reversed. Defendant is entitled to pretrial release. The cause is remanded for the circuit court's consideration of conditions for his pretrial release. The mandate shall issue *instanter*.

¶ 45    Reversed and remanded with directions.